[No. H003240. Sixth Dist. Jan. 12, 1989.]

MARGARET DE MILLE, Plaintiff, Cross-defendant and Respondent,
v.
CARLA BELGRANO RAMSEY, Defendant, Cross-complainant and Appellant;
MICHELE RAMSEY, Defendant and Appellant.

COUNSEL

A. David Parnie, D. Richard Barelli, Parnie & Barelli, William B. Daniels, Julie E. Moore and Heisler, Stewart & Daniels for Defendant, Cross-complainant and Appellants and for Defendant and Apellant.

Andrew H. Swartz, Spiering, Swartz & Kennedy, Leland Crawford and Crawford & Davidson for Plaintiff, Cross-defendant and Respondent.

OPINION

**BRAUER, Acting P. J.**—Two sisters agreed in writing that they would share equally any inheritance received from their mother, notwithstanding any unequal disposition her will might provide. The mother died and in her will left the bulk of the estate to one daughter in a spendthrift trust, with the remainder to a granddaughter. This appeal presents the question whether the sisters' agreement to share and share alike can be enforced in light of provisions in the trust that trust principal and income shall not be subject to the claims of creditors and may not be voluntarily or involuntarily alienated, and in view of the fact that the granddaughter holds a remainder interest in the trust.

The trial court found that the agreement was enforceable and ordered that the daughter who was the trust beneficiary pay to her sister one-half of all monies she received, whether directly or indirectly, from the trust. We affirm the judgment.

## BACKGROUND

Margaret Belgrano Kiebler (Kiebler) had three daughters, one of whom predeceased her. This dispute involves the other two daughters, Margaret De Mille (Margaret) and Carla Ramsey (Carla), and Carla's daughter Michele Ramsey (Michele).

During the times which concern us here, Margaret and Carla were loving sisters who maintained a close relationship, keeping in touch through the years by letters, phone calls and personal visits. They trusted and confided in each other. Their relationship with their mother was, on the other hand, somewhat strained. They both describe Kiebler as a difficult person, changeable and irritable, who would sometimes try to control the two daughters by playing one off against the other.

Carla was married to Ray Ramsey in 1970, and the two were separated in 1981. Ramsey had experienced a series of financial setbacks during the years of their marriage, to the extent that Carla became worried that her inheritance would be devoted to the benefit of Ramsey's creditors. Carla communicated these concerns to her mother and asked that measures be taken to protect her inheritance. Shortly thereafter, in 1980, Kiebler wrote a will which left Carla's one-third share of the estate in a spendthrift trust. The will provided that "This trust is created for the protection of my daughter from possible claims of creditors. If, in the trustee's discretion, there is no longer a need for such protection, the trustee may terminate this trust and distribute all of the trust estate to my daughter, CARLA BELGRANO RAMSEY." Margaret's husband, Richard De Mille, was named cotrustee with United California Bank. Both Carla and Margaret were sent copies of this will shortly after it was prepared.

Thereafter, the daughters became increasingly concerned about their mother's changing attitudes and unpredictable behavior. In Carla's words, "we both had problems with my mother, who tended to manipulate one against the other." In 1982, Carla called Margaret and suggested that the two of them make an agreement to share equally what was left to them when their mother died. This was entirely Carla's idea. According to her, "it just seemed a way to preserve our friendship."

An agreement was drafted by Margaret's husband, Richard De Mille, and sent to Carla. Carla consulted with her attorney, Eugene Epstein, who researched the matter and made some changes so that the language of the agreement conformed to established law. The agreement was signed in July of 1982 by both Carla and Margaret before notaries. It provides in pertinent part as follows: "[I]n consideration of our mutual love and affection and desire to avoid litigation over the estate of our MOTHER, we are entering into the following agreement: 3. That we shall inherit equally from our MOTHER, notwithstanding any changes she may make in her Will to leave us unequal shares."

In the years that followed, Carla and Margaret continued their close relationship, from time to time reaffirming their agreement regarding their inheritance. For example, in a January 1983 letter, Carla wrote to Margaret: "I am so glad we have our agreement."

In 1985, Kiebler changed her will. After several specific bequests the new will left the bulk of the estate to the spendthrift trust created for Carla's benefit, with the explanation "that the difference in provision for my two living daughters is not due to lack of love or affection but is based on circumstances and need." Carla was to receive periodic payments of all of

the net income from the trust estate. Moreover, if need be the trustee was authorized to invade the trust principal "up to the whole thereof," for Carla's maintenance and support, including the education of her daughter Michele.

The language creating the trust and the material terms of the trust were the same as in the 1980 will, with the exception that Carla's friend and attorney Eugene Epstein replaced Richard De Mille and United California Bank as trustee. The 1985 will provided, as had the previous one, that if there was no longer a need to protect Carla from creditors, the trustee could in his discretion terminate the trust and distribute all the assets to Carla. If Carla died while the trust was still in existence, it would terminate and the entire trust estate would be distributed to Michele.

Carla and Margaret did not learn of the terms of the new will until shortly after their mother's death in December of 1985. When they were told about the unequal distribution, Margaret asked Carla whether she would honor their agreement. Carla assured her she was "not the kind of person to go back on my word."

On or about March 18, 1986, attorney Epstein wrote to Margaret's attorney stating: "I think your analysis is correct that your client is entitled to receive one-half of the income received by Carla Ramsey during her lifetime." Soon after this, however, disagreements developed regarding Margaret's rights, if any, to one-half of the trust principal. Eventually, in June of 1986, Margaret filed this action for declaratory relief, asking for a determination that the sisters' agreement was valid and enforceable as to all distributions made from the Kiebler estate, including any distributions from the testamentary trust, whether of income or principal.

Carla answered and cross-complained for rescission of the agreement on the basis of mutual mistake. She alleged that neither sister had known at the time they made their agreement that their mother's will would create a testamentary spendthrift trust, shielding Carla's share of the estate from claims of creditors, and that their agreement would therefore frustrate the intent of the testator and violate public policy.

Carla's daughter Michele filed a separate answer, alleging that her rights as a remainder beneficiary of the trust would be impaired if the agreement were enforced.

The matter was tried before Judge Richard Silver, who took it under submission and thereafter issued a comprehensive and well-reasoned intended decision, summarizing the evidence and making these points: Agree-

ments to divide an estate differently from what may be provided by the testator are enforceable as between the parties; however, such agreements cannot affect property which does not pass to the parties, nor can they be enforced against nonparties. The evidence showed that both sisters were aware that Carla's share would probably be protected by a spendthrift trust, and both intended their agreement to include trust assets. Any ambiguities in the agreement should be resolved against Carla, since the agreement was her idea and the written contract was reviewed and revised by her attorney. Furthermore, the trust was created by Kiebler at Carla's request, and the evidence indicated that it could be terminated when Carla no longer needed protection from her husband's creditors. Largely because of this termination provision, the court considered Michele's remainder interest to be "minimal" and not sufficient to defeat Margaret's contractual rights.

Judgment was entered May 1, 1987. It provided that Margaret was entitled to one-half of all monies Carla received from the spendthrift trust, and ordered that Carla convey to Margaret one-half of any funds received by her, whether distributed to her directly or spent on her behalf, and whether said funds were distributions of income or principal. The court retained jurisdiction to supervise enforcement of the judgment.

## CONTENTIONS ON APPEAL

Carla and Michele have both appealed. They contend that the agreement between Carla and Margaret constitutes a prior assignment by Carla of her interest in the spendthrift trust. As such it is prohibited by the terms of the trust. Moreover, Margaret's rights, if any, as a creditor of Carla are limited by provisions in the new Trust Law. (Prob. Code, § 15000 et seq., hereafter referred to as the Trust Law.) In addition, Michele challenges the court's ruling that Margaret's contractual rights take precedence over her rights as a trust beneficiary under Kiebler's will.

## DISCUSSION

### Enforceability of the Agreement

■ No one disputes the general rule that agreements such as that made by Carla and Margaret are enforceable. The case *Spangenberg* v. *Spangenberg* (1912) 19 Cal.App. 439 [126 P. 379] settled that point. In *Spangenberg,* six siblings made a contract to pool and divide equally whatever their father might leave them in his will. The consideration for the contract was expressly stated to be " 'their love and affection for one another' " and "being 'desirous of avoiding litigation over the estate' of their father." The father died and his will left equal bequests to the siblings and the entire residue to

two of them. One of the residuary beneficiaries objected to the enforcement of the contract. He contended that the agreement was void because the heirs apparent could not make a contract to divide property to which they might never have a right. And he argued that such an agreement to ignore the will provisions amounted to a fraud upon the testator and was against public policy. The court disagreed, finding that there was good consideration for the contract and that no policy or statute prohibited its enforcement. (*Id.* at p. 447.)

Carla and Margaret's agreement was fashioned with *Spangenberg* in mind. Attorney Epstein inserted the language of consideration quoted above from *Spangenberg,* and both sisters were provided with a copy of the case, which they read. Thus there is no doubt that the parties were aware their agreement was an enforceable contract.

 Carla argues that the presence of the testamentary trust distinguishes our case from *Spangenberg.* In *Spangenberg* public policy considerations were resolved on the ground that the testator's intent was not frustrated by the heirs' agreement because the testator evidenced no intent to restrict the devisees' power to dispose of their share as they wished once they received it. The creation of a testamentary spendthrift trust, on the other hand, demonstrates a contrary intent, by providing certain restraints on the beneficiary's power to transfer or otherwise dispose of her interest. Carla argues that in such a case an agreement by the heirs to pool and share their interests in an estate is in conflict with the testamentary plan. Consequently its enforcement would run against the strong public policy to give effect to the testator's intent.

Margaret points out that the court's order does not purport to interfere with the administration of the trust; rather it is directed to Carla and pertains only to monies received by her out of trust, which she could presumably dispose of as she wishes. Even though the order does not directly affect property in trust, however, it has the effect of imposing a lien upon the proceeds received by Carla. Such a procedure was expressly disapproved by our Supreme Court in *Kelly* v. *Kelly* (1938) 11 Cal.2d 356 [79 P.2d 1059, 119 A.L.R. 71] in the context of that case.

In *Kelly* a husband and wife executed a property settlement agreement in which Mr. Kelly assigned to Mrs. Kelly a one-half interest in property he was to receive as remainder beneficiary of a trust upon the death of his mother. Both parties were aware that this trust contained spendthrift provisions. It was the trustor's stated intent to benefit only the beneficiaries " 'to the utter exclusion of their creditors and alienees, past, present and future,' " and that any disbursement to beneficiaries thereunder be made

" 'free and clear of his or her debts, contracts, engagements, alienations and anticipations . . . .' " (11 Cal.2d at p. 359.)

Following the death of Mr. Kelly's mother and the consequent termination of the trust, Mrs. Kelly sought to enforce the agreement and asserted a claim to one-half of the money and other personal property distributed to Mr. Kelly. Mr. Kelly took the position that the terms of the trust rendered any prior assignment of his interest unenforceable. Faced with these competing interests, the high court made the following observations: "It is of the essence of a spendthrift trust that it is not subject to voluntary alienation by the *cestui,* nor subject to involuntary alienation through attachment or other process at the suit of his creditors. (Citations omitted.) But it is everywhere agreed that after the beneficiary has actually received the trust property his creditors may reach it and he may dispose of it as he wishes. (Citations omitted.) A voluntary assignment executed before payment to the beneficiary confers on the assignee no right to demand payment or delivery from the *trustee* as it becomes due to the beneficiary. . . . But does the assignment to Mrs. Kelly executed during the continuance of the trust nevertheless give her as such assignee a claim upon the trust property after it shall reach the hands of the beneficiary?" (*Kelly, supra,* 11 Cal.2d at pp. 362-363.)

The *Kelly* court answered its question in the negative, saying this: "We are of the view that the intention of the trustor that the beneficiary should receive the trust property free and clear of specific liens and charges may and should be given effect. . . . [I]t cannot be held that the beneficiary, upon receipt of trust property, in turn holds said specific property, or its proceeds, in trust for his assignee under an assignment made prior to his receipt of the trust property without doing violence to the intent of the trustor . . . ." (*Kelly, supra,* 11 Cal.2d at p. 363.) The court held that even though the prior agreement gave Mrs. Kelly no right in specific trust property received by her husband, the agreement was not completely without effect. It could be enforced by means of the usual remedies available to a promisee in an action for breach of contract. In other words, Mrs. Kelly was entitled to the value of the property she would have received had her husband performed his promise. Having obtained a judgment for damages, she could then levy upon property not exempt from execution, including property received by Mr. Kelly from the trust.

Carla contends that *Kelly* is controlling authority and prohibits a judgment which orders her to pay Margaret one-half of any distribution she will receive from the trust. Under *Kelly,* Margaret would be required to bring suit to recover her one-half interest only *after* Carla received each payment.

We find *Kelly* to be distinguishable. In *Kelly* there was no question that the trustor intended to create a spendthrift trust. A stated purpose of the trust was to prevent any beneficiary from assigning his interest in the trust in anticipation of receiving it. It therefore follows that enforcement of the agreement as a lien on the proceeds clearly defeats the trustor's intent. In our case the court made a different finding, namely that the trust was not created by the trustor to curb the spendthrift tendencies of a beneficiary; rather it was Carla's idea, and its creation was for the sole purpose of protecting her inheritance from the creditors of her estranged husband.

■ In interpreting a writing, including a testamentary one, the court may consider extrinsic evidence if relevant to prove a meaning to which the language of the instrument is reasonably susceptible. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Estate of Russell* (1968) 69 Cal.2d 200, 212 [70 Cal.Rptr. 561, 444 P.2d 353].) On appeal any reasonable construction will be upheld if supported by substantial evidence. (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 747 [131 Cal.Rptr. 873, 552 P.2d 1169].)

■ There is evidence to support the court's interpretation of the language of Kiebler's will. Carla testified that she asked her mother to make some provision in the will to protect her inheritance for her own use. Shortly thereafter her mother wrote a will leaving Carla's share in trust, with the explanation that "this trust is created for the protection of my daughter from possible claims of creditors," and giving the trustee discretion to terminate the trust and distribute the entire proceeds to Carla if "there is no longer a need for such protection." None of the explicit prohibitions contained in the *Kelly* trust is present in Kiebler's will. Instead there is a standard recitation that the interests of the beneficiary shall not be subject to the claims of creditors and may not be voluntarily or involuntarily alienated or encumbered.

The trial court was entitled to determine, as it did, that in spite of the boilerplate provision, Kiebler's "was not a spendthrift trust." Her intent, as expressed in the language creating the trust, was not to keep money out of the hands of her daughter Carla but rather to keep creditors of Carla's husband at bay for as long as Carla needed this protection. This being so, the court's order enforcing the sisters' agreement from proceeds received by Carla did not frustrate the trust purpose, and is not inconsistent with the principles expressed in *Kelly*.

### Application of the New Trust Law

Carla argues that the judgment violates certain provisions of the new Trust Law. The new Trust Law became operative July 1, 1987. It applies to

all proceedings commenced before that date, unless the court determines that its application would substantially interfere with the rights of the parties. (Prob. Code, § 15001.) The trial here took place in February 1987. The record shows that the court considered the new law and decided that its provisions did not invalidate the judgment. We share this view.

The sections principally relied upon by Carla are sections 15300, 15301, and 15306.5 in chapter 2, part 2 of the new law. ■ Sections 15300 and 15301 simply clarify prior law that restraints on the transfer of trust income or principal are valid. (See, e.g., former Civ. Code, § 867.) If so restrained, the beneficiary's interest "may not be transferred and is not subject to enforcement of a money judgment *until paid to the beneficiary*." (Prob. Code, §§ 15300, 15301, italics added.)

The court found that enforcement of the agreement against Carla once funds are distributed to her is consistent with these statutes. Carla argues that the underlined language was not intended to permit enforcement of a prior assignment of interest; such a construction would violate the restraint on transfer. Any transfer attempted before money is paid to the beneficiary is unenforceable. Consequently, an assignee must proceed to obtain a money judgment against the beneficiary only after funds are distributed out of trust. This interpretation is supported by the *Kelly* case, which is cited in the annotations to these sections.

Under the facts of *Kelly,* where a spendthrift beneficiary has made a prior assignment of his interest, Carla's interpretation of these sections would be meaningful. As we have discussed above, however, the trial court found the spendthrift provisions of Kiebler's trust were not aimed at Carla. Moreover, Carla did not technically transfer any present interest in the trust, as did the beneficiary in *Kelly*. Rather she agreed with her sister that they would inherit equally "what was left when mother died." These differences make *Kelly* inapplicable to our case, since the policy considerations underlying that decision do not operate here. By the same token, the statutory proscriptions of sections 15300 and 15301 are not violated by enforcement of the agreement against Carla after funds are paid to her.

Other sections of this chapter of the new Trust Law provide that a creditor may, under certain circumstances, reach trust income or principal which has become due and payable to the beneficiary. The creditor must first petition the court under Code of Civil Procedure section 709.010. She may then obtain an order directing the trustee to satisfy the judgment in whole or part from the payment to which the beneficiary is entitled. Such an order, however, may not exceed 25 percent of the payment, and may not include any amount which the court deems necessary for the support of the

beneficiary. (Prob. Code, § 15306.5.) These provisions restate the substance of former law. (See legis. committee com., West's Ann. Prob. Code, § 15306.5 (1988 supp. pamp.) p. 504.)

■ Carla argues that the court's judgment ordering her to pay half of each payment to Margaret circumvents the requirements of Code of Civil Procedure section 709.010 and Probate Code section 15306.5. We agree with Margaret that those sections do not apply to our case.

Code of Civil Procedure section 709.010 provides a procedure for enforcement of a money judgment only. The order obtained by a section 709.010 petitioner directs payment by the trustee in satisfaction of the judgment. Margaret is not the holder of a money judgment. Nor does her judgment order payment by the trustee. Her suit is an equitable proceeding to determine the enforceability of an agreement between two heirs to share equally in their mother's estate. We have concluded that the court's enforcement order does not defeat the testator's intent and violates no public policy. No purpose would be served by imposing the restrictions contained in these sections.

### Rights of the Remainder Beneficiary

■ We turn now to Michele's separate contention. Michele claims that she has a vested remainder interest in the trust, since it provides for distribution of the entire trust estate to her upon the death of her mother. She was not a party to the agreement between Margaret and Carla, and did not consent to it. Its enforcement diminishes her interest to the extent that the trust corpus is depleted in order to accommodate payments to Margaret. She claims this amounts to an invasion of the trust in violation of its terms and in derogation of her rights.

As a trust beneficiary, Michele has a right to enforce the trust in accordance with its terms. Her rights are violated only if the trust is administered in a way which violates its provisions or the trust purpose. Invasion of corpus is expressly authorized by the terms of the Kiebler trust. Article six, paragraph 2, provides that the trustee may invade principal if "in [his] absolute discretion" Carla needs money *"for any reason"* for her health, maintenance and support, over and above that provided by payments of net income. The trustee may "pay to or apply for [Carla's] benefit such amounts of the principal of the trust estate, *up to the whole thereof."*

In interpreting a similar provision in a testamentary trust, a New York court found that the only limitation on the exercise of power by the trustee was that he act in good faith. (*In re McNeel's Trust* (1967) 54 Misc.2d 243

[282 N.Y.S.2d 103, 107].) Other courts have found that the words "for the benefit of" the beneficiary authorize payments which may be made to others for the performance of the beneficiary's legal duties, since that amounts to a "benefit." (See, e.g., *Orr* v. *Moses* (1947) 94 N.H. 309 [52 A.2d 128, 129]; *Fowler* v. *Hancock* (1938) 89 N.H. 30 [197 A. 715].) In our case it cannot be said that the terms of Kiebler's trust are necessarily violated if sums from principal are applied to satisfy an obligation which Carla made freely and which she testified she "would like to uphold."

■■ The most important consideration in interpreting a provision for discretionary payment of principal to or for a beneficiary is whether the primary object of the trust was to provide for the life beneficiary or to preserve the principal for the remainderman. (See Annot. (1946) 2 A.L.R.2d 1383, 1386, § 2 and cases cited.) As to that issue, there is no question here. Kiebler stated that the purpose of the trust was the protection of Carla. The entire estate passes to her if the trustee finds the trust is either no longer necessary or economically feasible. And Carla is entitled to all the income and so much principal as needed, up to the whole amount. Michele will take only if Carla dies before any of these occurrences. Thus Kiebler made clear that Carla was the primary object of her bounty.

The two cases principally relied upon by Michele are readily distinguishable. *DiMaria* v. *Bank of California* (1965) 237 Cal.App.2d 254 [46 Cal.Rptr. 924] concerned a trust created for the benefit of the settlor. The trust provided that the trustee pay the entire income to the settlor for life, and authorized the trustee to invade principal *only* if the income should be insufficient to provide for reasonable support, care and comfort for the settlor. Upon the death of the settlor, the entire corpus would pass to the settlor's children. A creditor of the settlor sued the trustee, claiming an absolute right to payment from trust principal. The court refused to order payment since no showing had been made that the income was insufficient to meet the settlor's needs, including payment of her debts. Consequently, invasion of principal to pay the debt would violate the terms of the trust and defeat the rights of the remaindermen.

*Estate of Van Deusen* (1947) 30 Cal.2d 285 [182 P.2d 565] presents a similar scenario. That case concerned a testamentary trust, which provided for income for life to the testator's children and the corpus to the grandchildren. The income proved to be insufficient to meet the needs of the children and they petitioned the court to allow invasion of the principal, claiming that it was the testator's intent that they be provided for comfortably. The court denied their petition, finding that the terms of the trust allowed only for distribution of income to the children. There were no provisions for

invasion of principal. Therefore, principal could not be used by the life beneficiary without the consent of those holding the remainder interest.

Finally, Michele claims that her remainder interest should be characterized as "vested subject to divestment," while Margaret argues it is a "contingent remainder." We do not think these distinctions make a difference. Even if Michele has a vested remainder interest, her interest is made subject to divestment to the extent that the principal is used by Carla or the trust is terminated, *so long as that is done in accordance with the purpose and provisions of the trust.*

We conclude that Carla's performance of her agreement with her sister can be accomplished without violating the trust created for Carla's benefit. Enforcement of the agreement therefore does not violate such limited rights as Michele has.

Judgment is affirmed.

Capaccioli, J., and Premo, J., concurred.

The petition of all appellants for review by the Supreme Court was denied May 17, 1989.