Filed 10/15/13  Kalfin v. Kalfin CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DEBRA R. KALFIN, | |
| Plaintiff and Respondent, | G046639 |
| v. | (Super. Ct. No. 30-2010-00422625) |
| JUDITH A. KALFIN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, H. Michael Brenner, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Freeman Firm, Thomas H. Keeling, Franklin J. Brummett; Law Offices of Scott E. Schutzman and Scott E. Schutzman for Defendant and Appellant.

Lamb & Kawakami, Patrick L. Rendon; Adams & Nelson and Keith A. Robinson for Plaintiff and Respondent.

Judith A. Kalfin (Judith) appeals from the judgment in favor of her younger sister, Debra R. Kalfin (Debra),[1] in this breach of contract and financial abuse action. Debra is blind and disabled and has suffered from numerous serious medical conditions throughout her life, frequently relying on her father, Harry Kalfin (Harry) for financial support. A few months before his death, Harry amended his long-established estate plan from one dividing the bulk of his sizeable estate equally between his two daughters, to one leaving virtually the entire estate to Judith in exchange for her promise to take care of Debra and make sure she would have everything she needed for as long as she lived. After Harry died, Judith declined to provide any financial assistance to Debra, and Debra filed this action. Her causes of action for breach of contract and financial abuse of a dependent adult (Debra) and an elder (Harry) (Welf. & Inst. Code, § 15600 et seq.), were tried before a jury. It returned special verdicts in Debra's favor on her breach of contract and financial abuse of a dependent adult claims, but against her on her financial abuse of an elder claim. The jury awarded Debra approximately $1.4 million in compensatory damages and $260,000 in punitive damages.

Judith contends: (1) inconsistent special verdicts pertaining to Debra's financial abuse cause of action require reversal and retrial of that cause of action; (2) Debra was not entitled to a jury trial because her action was more properly characterized as a probate action triable only by the court sitting in equity; (3) Judith's promise to her father to financially support her disabled sister is too indefinite to constitute a contract, the oral contract is unsupported by adequate consideration, and the oral contract is barred by the statute of frauds; and (4) the trial court erred by refusing to declare a mistrial after Debra's counsel attempted to ask Judith whether her own estate

---

[1] For convenience and clarity, we will refer to the family members by their first names, with no disrespect intended.

2

plan included provisions for her pets. We find no merit to Judith's contentions and affirm the judgment.

## FACTS

Debra was born in 1957 and was in her early 50s when her father, Harry, passed away in April 2010. Her older sister, Judith, is her only sibling. Neither Debra nor Judith is married and neither has any children.

Debra has been plagued with serious and severe health problems for her entire life. As a child, she was diagnosed with acute severe asthma and Type 1 (juvenile) diabetes. She was frequently hospitalized, and often developed bronchitis and pneumonia. The steroid treatments she required for her asthma made her diabetes difficult to control, and as she grew older, she became insulin intolerant. In 1993, Debra was diagnosed with a retina disease common among diabetics. She had numerous laser treatments and surgeries, but after a surgery in 1997, she was left completely blind. Shortly after going blind, Debra suffered renal failure and went on dialysis. Complications with dialysis led to her requiring kidney and pancreas transplants in 2000. In 2007, Debra was diagnosed with colon cancer, and she underwent surgery in 2008 and again in 2009.

Debra tried to live a "normal" life when she was younger. She went to college, held part-time jobs, and pursued her favorite pastime of horseback riding—an expensive hobby financed by her father. After graduating from college, Debra worked full-time at Disneyland, but as her health continued to deteriorate, her medical leaves and hospitalizations became more frequent and longer, and by 1987, she went on disability. Since then her only significant independent source of income has been $900 a month Social Security and $327 a month in long-term disability insurance.

Debra's father, Harry, was a successful engineer and real estate investor. He was described as having a domineering personality—"He was the boss. There was no doubt of it." Despite being a "curmudgeon[l]y kind of guy," Harry nonetheless took

3

pride in being a good provider for his family and in knowing they would not have to endure the poverty he endured growing up during the Great Depression. After his wife (Judith and Debra's mother) passed away in 1988, Harry met Marjorie Solomon (Marjorie). Although not legally married, the two lived together for the rest of Harry's life and held themselves out as husband and wife. Harry provided both his daughters with a high standard of living throughout their lives.

Around the time Debra went on disability in 1987, she and Judith bought a house together in Yorba Linda (hereafter the Wabash house). They originally agreed to evenly split the costs of the house, including mortgage, taxes, and insurance. However, Debra eventually ran out of money and, unable to work, needed financial assistance. In 1993, Harry gave his daughters $100,000 to pay down the mortgage on the Wabash house. Although he had both daughters sign a promissory note for the money, the money was considered to be a gift to Debra so she could remain in the house, and neither sister ever made any payments on the note. After Harry's gift, Debra never made another payment towards the house. Judith, who had a job paying $112,000 a year, eventually moved out of the Wabash house when she bought another house in Yorba Linda with her boyfriend. Debra remained living in the Wabash house. Harry also allowed Judith to live rent free in one of his many rental units located in Hermosa Beach so she could be closer to her job during the week, with the understanding she would continue paying the costs associated with the Wabash house including taxes and insurance, which she did.

When Debra went blind in 1997, her relationships with family and particularly her father became strained, and they argued a lot. Debra lived with Harry and Marjorie for a while, but moved back to the Wabash house so she could feel more independent. She refused Harry's offer to hire a full time live-in assistant for her, and she adapted to her blindness by taking mobility and Braille classes, getting a guide dog, and learning new skills and hobbies. Although their relationship was strained, Debra

4

continued to visit her father a couple times a month, and he remained supportive of her. Debra asked for and received financial support from Harry as she needed it. Harry paid for many of Debra's expenses, including a new refrigerator, a new roof for her house, medical expenses, and veterinary bills for her guide dog. Debra and Judith both testified Harry always stepped in and helped them whenever they needed help.

Harry's living trust, prepared in 2002, provided that on his death all the trust assets would be divided equally between Judith and Debra, with the exception that Marjorie would have a life estate in the house he and Marjorie shared. Marjorie was designated as the successor trustee followed by Judith and Debra as successor co-trustees. Harry often joked about the great lifestyle his daughters would have when he died.

As Harry grew older, he became increasingly concerned about Debra. He was worried that if she was left any considerable amount of money or property, she would lose it. In October 2009, while he was in the hospital, Harry summoned a notary from the financial company that prepared his living trust, Marjorie, and Judith to his hospital room. He had the notary prepare two documents requesting changes be made to his living trust leaving the bulk of his estate to Judith and only $1,000 to Debra, and removing Debra as a successor trustee. The notary testified Harry was very clear about his instructions and neither Judith nor Marjorie said anything during the meeting. On November 10, 2009, the notary came to Harry and Marjorie's home with the prepared trust amendment documents, which Harry executed. Judith was not present. The notary had no reservations about Harry's soundness of mind or about his understanding of the changes he was making to his living trust. Harry passed away on April 11, 2010.

Marjorie testified Harry frequently discussed with Judith his concerns about Debra's health and her future. For the last five years of Harry's life, Judith came to the house on Sunday afternoons and during their "chats" "[Harry] would always tell [Judith] to take care of her sister[,]" by which he meant "financially . . . see that [Debra] was taken care of . . . referring to when he would be deceased." Marjorie testified that even

5

after Harry amended his trust in November 2009, he continued to express to Judith in their Sunday visits that he expected Judith to take care of Debra financially. Marjorie testified it was never Harry's intention to have Debra cut off financially. Judith gave Harry her word that she would take care of Debra financially, and Marjorie never heard Judith say anything to Harry to the contrary. Since Harry's death, Judith had not provided Debra any financial assistance despite Debra's repeated requests.

Los Angeles Superior Court Judge Ruth Kwan had been a close friend of Judith's, and the entire Kalfin family, from the time she and Judith were young teenagers. Kwan was considered the third daughter of the family. Kwan testified to conversations and e-mail exchanges she had with Judith about Judith's agreement with Harry to financially support Debra after he died. Their first face-to-face discussion took place right after Harry died, before his funeral. Judith told Kwan about Harry's arrangements for Marjorie, and then said he left Debra $1,000. Kwan assumed Judith meant $1,000 a month and immediately asked, "'How does he expect her to live on [$1,000] a month.' [¶] And instead of correcting me at the time, [Judith] says that her dad made her promise, and she promised him that she would take care of [Debra's] financial needs for the rest of her life." After Harry's funeral, Kwan, who was very concerned about how Debra would react when she learned about the change to the trust, asked Judith if she had told Debra about her promise to her dad, and Judith replied that she had not.

After their two face-to-face discussions, Kwan and Judith exchanged numerous e-mails concerning Debra's financial needs, in which Judith repeatedly acknowledged her promise to her father to support Debra. Judith told Kwan she was meeting with a financial planner to sort it all out. In an e-mail on May 25, 2010, Judith wrote to Kwan: "The one thing I know is that Dad never told me how he wanted it to happen, but he made me promise that I would look after [Debra]. I need to try and to figure out how to do that without compromising [Debra's] disability insurance payments." Kwan urged Judith to tell Debra about her promise to Harry. Kwan was very

6

concerned about Debra's poor health—"[h]ow much longer do you think she has given her physical condition, coupled with cancer and all the surgeries." On May 27, 2010, Judith wrote Kwan, "the trust people are telling me is that the first thing I need to do is transfer all of dad's stuff into my trust and then the second thing I need to do is figure out what to do for [Debra.]" Soon after this e-mail, Debra contacted Kwan, panicked because bills were piling up and expressing feelings of betrayal by her father.

A few days later, Kwan e-mailed Judith again urging her to assure Debra that she would be taken care of and inform her of the promise to Harry. Kwan urged Judith to explain to Debra her father had not taken her out of his trust to be "mean spirited" but he had "other concerns, such as her disability benefits . . . etc." and Harry had "relied on your promise to use his money to take care of her for the rest of her life. . . ." Judith responded to Kwan's e-mail and did not deny the promise she made to her dad, but she explained she knew her dad "did not want [Judith] to just hand over half of everything" because it would "disappear in no time." For her part, Judith was frustrated because Debra was "pretty much demanding her [half] of [Harry's] estate or she 'is going to take legal action against me.' Ironically I met with the financial planner [two days ago] to see what some options might be to set up income for her."

Debra continued to e-mail Kwan venting about her financial hardships and Kwan continued e-mailing Judith urging her to try to mediate the dispute with her sister and to start providing Debra with some level of financial support. By mid-June, Kwan e-mailed Judith asking why she still had not provided Debra with "even basic support for living expenses and medical expenses." "She is already quite sick, does she need the additional stress?" Kwan implored Judith to tell Debra it was Harry's intention that Judith would now take care of Debra's financial needs.

Finally, on June 20, 2010, Kwan e-mailed Judith, explaining Kwan was "at a point where [she] feel[s] . . . morally obligated to tell [Debra] that [Judith] made a promise to [their] dad to take care of all [Debra's] financial needs." On June 21, Judith

7

responded to Kwan that "[Harry] never requested that I make a promise to him that I would take care of all of [Debra's] financial needs." Additionally, Judith stated that because she and Debra had now both hired attorneys, she could not discuss the matter further with Debra. Kwan testified it was not until Judith retained an attorney, she for the "first time ever" denied she had promised her father to financially provide for Debra.

Debra testified that in a telephone conversation with Judith after Harry died, Judith acknowledged she "had promised [their] father that she would make sure I was provided for, taken care of, would have whatever I needed for as long as I'm alive." Debra testified Harry was concerned about her losing her disability benefits and her low-income health insurance if she inherited a lot of money and they had had several discussions about that starting around 2002. But no one ever had discussed a special needs trust.

Judith denied she ever made any kind of commitment to her father to financially support her disabled sister. At the hospital meeting in October 2009, when Harry directed that his trust be amended to leave 100 percent of his assets to Judith, Harry told Judith to sit in a corner and be quiet, and she complied. Judith testified Harry never asked her to promise to take care of Debra in exchange for changing his trust. The only direction Harry ever gave her was in a later conversation when he told her, "'Take care of your sister,'" and when she asked Harry to explain what he meant, Harry said, "'You figure it out, kid.'" But Harry never mentioned "the words 'take care of your sister' along with his decision to change the estate plan." "My father left the estate to me to do with as I will." Judith testified she "misspoke when [she] used the word 'promise'" in her e-mails to Kwan. Judith agreed that since her father's death, she has not given Debra financial support of any kind and has not paid any expenses, including property

taxes, on the Wabash house.[2]  Judith testified her father's estate was worth about $3,920,000.

An estate planning expert testified Harry's 2002 living trust contained a standard provision for a special needs trust in the event a beneficiary of the trust was disabled.  The expert explained such provisions are commonly included in trust documents so a disabled beneficiary's government benefits will not be disturbed as a result of the inheritance.  The expert saw no evidence the special needs trust provision in Harry's trust had ever been discussed with Harry when the trust was created.  The 2009 amendment would not have affected the special needs trust provision.  The notary from the financial services company that prepared Harry's living trust testified he never had any discussions with Harry about the special needs trust provision.

George Miller, an accountant and economist, testified for Debra regarding damages.  He valued Harry's estate at $3 million at the time of his death.  He worked from the premise Debra would have only half of the estate available for her support.  He testified Debra's annual support needs were approximately $72,000 a year based on the median income in the community in which Debra resided (Yorba Linda) of $51,584 per year, plus the cost of an attendant to assist her due to her disabilities (another $20,560 per year).  Miller testified it would take $1,438,000 to provide Debra that level of support for the rest of her life expectancy.

## PROCEDURE

Debra's original complaint was filed against Judith and Marjorie, as an individual and in her capacity as trustee of Harry's trust.  The original complaint alleged causes of action for breach of contract, fraud, negligent misrepresentation, financial abuse, and imposition of a constructive trust.  Judith filed a motion to compel contractual

---

[2]  Judith filed a separate partition action against Debra in relation to the Wabash house, which was tried separately before the same trial judge and is not the subject of appeal.

arbitration in accordance with a provision in Harry's living trust, which was denied. The operative first amended complaint was filed, and contained the same causes of action, but was also captioned as a "petition by contestant for order to direct transfer of personal [and] real property" and sought additional remedies under the Probate Code. Debra then dismissed Marjorie from the action. Judith's subsequent motion for summary judgment was denied, but the court granted summary adjudication as to the fraud and negligent misrepresentation causes of action.

The case was tried before a jury on the breach of contract and financial abuse causes of action. The jury returned a special verdict in favor of Debra on her breach of contract cause of action finding she suffered $1,400,000 in economic damages. It returned a special verdict in Debra's favor on her financial abuse of a dependent adult cause of action, but against her on her financial abuse of an elder claim, and awarded her the same economic damages and $5,000 in non-economic damages. The jury also found "by clear and convincing evidence" Judith had acted with "malice, oppression, or fraud" and awarded Debra $260,000 in punitive damages. The trial court denied Judith's motion for new trial. Judith timely filed a notice of appeal from the judgment.

The trial court subsequently granted Debra's motion for attorney fees and awarded her $700,000 in attorney fees and $28,749 in costs. The attorney fees award is the subject of a separate appeal.[3] The court also granted Judith's motion to correct the judgment and entered an amended judgment nunc pro tunc on June 28, 2012.

---

[3]     We take judicial notice of the record in the companion appeal, *Debra R. Kalfin v. Judith A. Kalfin* (Oct. 15, 2013, G047275) [nonpub. opn.]). (Evid. Code, § 452, subd. (d).)

DISCUSSION

*I. Inconsistent Special Verdicts*

Judith contends the judgment must be reversed because the jury returned inconsistent special verdicts on the financial abuse cause of action. We reject her contention.

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.] If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. [Citations.] If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency. [Citations.] [¶] On appeal, we review a special verdict de novo to determine whether its findings are inconsistent. [Citation.] With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the verdict. [Citations.] ""'Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.'" [Citations.]' [Citation.] 'The appellate court is not permitted to choose between inconsistent answers. [Citations.]' [Citation.] The proper remedy for an inconsistent special verdict is a new trial. [Citation.]" (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357-358, fn. omitted.)

Debra's case went to the jury on two causes of action: breach of contract and financial abuse in violation of Welfare and Institutions Code section 15610.30. But there were two distinctly different claims encompassed by the latter cause of action: financial abuse of a dependent adult, i.e., Debra, and financial abuse of an elder, i.e., Harry. The trial court gave the jury separate instructions as to each claim via modified versions of CACI No. 3100, and gave separate special verdict forms as to each claim.

11

With regard to the dependent adult financial abuse claim, as relevant here, the trial court instructed the jury Debra had to prove "Judith . . . took, appropriated, obtained or retained Harry['s] property;" and "Judith . . . took, appropriated, obtained or retained Harry['s] property with the intent to defraud or for a wrongful use."  The final sentence of the instruction told the jury, "One way Debra . . . can prove that Judith . . . took, appropriated, obtained, or retained Harry['s] property for a wrongful use or by fraudulent means is by proving that Judith . . . knew or should have known that her conduct was likely to be harmful to Debra . . . ."

The instruction as to the elder financial abuse claim was substantially similar, again telling the jury Debra had to establish "Judith . . . took, appropriated, obtained or retained Harry['s] property;" and she "took, appropriated, or obtained Harry['s] property with the intent to defraud or for a wrongful use."  The final sentence of this instruction told the jury, "One way Debra . . . can prove that Judith . . . took, appropriated, obtained, or retained Harry['s] property for a wrongful use or by fraudulent means is by proving that Judith . . . knew or should have known that her conduct was likely to be harmful to Harry . . . ."

The case was submitted to the jury with four special verdict forms.  Special verdict form No. 2 pertained to the financial abuse of a dependent adult claim (i.e., Debra).  It asked the jury to answer the following questions:  (1) "Was [Debra] a dependent adult at the time of the conduct?"; (2) "Did Judith . . . take, appropriate, obtain or retain Harry['s] property with the intent to defraud or for a wrongful use?"; (3) "Was Judith['s] conduct a substantial factor in causing harm to Debra . . . ?"; (4) 'What are Debra['s] damages?" and (5) "Did Debra . . . prove by clear and convincing evidence that Judith . . . acted with malice, oppression, or fraud?"  The jury answered "Yes" to each question, and found Debra suffered $1.4 in million economic damages and $5,000 in noneconomic damages.

12

Special verdict form No. 3 pertained to the financial abuse of an elder claim (i.e., Harry). It began with the question, "Was Harry . . . 65 years of age or older at the time of the conduct?" to which the jury replied, "Yes." The second question was identical to the second question asked on special verdict form No. 2, i.e., "Did Judith . . . take, appropriate, obtain or retain Harry['s] property with the intent to defraud or for a wrongful use?" The jury replied, "No" to this question and therefore did not move on to the remaining questions.[4]

Judith argues the jury's finding in special verdict form No. 2 that "Judith . . . [took], appropriate[d], obtain[ed] or retain[ed] Harry['s] property with the intent to defraud or for a wrongful use" is inconsistent with its finding in special verdict form No. 3 that she did not "take, appropriate, obtain or retain Harry['s] property with the intent to defraud or for a wrongful use." We disagree.

When we can interpret special verdict responses as being consistent we must, and in doing so, we consider not just the special verdict forms but also the pleadings, evidence, and jury instructions. (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456-457.) As observed in *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682 (*City of San Diego*), an inconsistent verdict results when the fact finder makes "'inconsistent determinations of fact based on the same evidence'" and "may arise from an inconsistency between or among answers within a special verdict [citation] or irreconcilable findings. [Citation.]" In *City of San Diego*, the jury valued land in an eminent domain action at $445,000 per acre for purposes of determining the fair market value of the land taken, but valued it at $850,000 per acre for purposes of severance damages. The court held it was inconsistent

---

4        Special verdict form No. 1 pertained to the breach of contract cause of action. The jury answered "Yes" to each question and found Debra suffered $1.4 million in economic damages. Special verdict form No. 4 pertained to punitive damages. The jury found Judith acted with malice and awarded Debra $260,000 in punitive damages.

13

for the jury to give different value to "the same property at the same point in time . . . ." (*Id.* at p. 683.)  Similarly in *Zagami*, *Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1093-1094, the court held the jury's special verdict finding that a skiploader was worth $30,000 was hopelessly inconsistent with the finding plaintiff suffered damages of $15,500, and thus the damage award had to be reversed and remanded for new trial.  (See also *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344-1346 [special verdict finding of no breach of contract inconsistent with finding breach of implied covenant of good faith and fair dealing]; *Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1186 [special verdict finding vehicle was negligently designed inconsistent with finding vehicle had no design defect].)

By contrast, in *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424, an employment discrimination case, the jury returned a special verdict finding the employer had failed to engage in an "interactive process" to determine reasonable accommodation for the employee's disability but did not fail to provide a reasonable accommodation for the employee's disability.  The court held the special verdict findings were not inconsistent because they involved separate causes of action and proof of different facts.

Here, in denying Judith's motion for new trial, the trial court interpreted the responses to the two special verdicts as being consistent because they dealt with different claims concerning harm to different people.  We conclude the instructions and evidence support this interpretation—particularly in view of the order of the verdict forms and the order in which the jury would have logically approached its task.

The first relevant special verdict form was special verdict form No. 2, which pertained to financial abuse of a dependent adult, i.e., Debra.  In question 2 the jury was asked "Did Judith . . . take, appropriate, obtain or retain Harry['s] property with the intent to defraud or for a wrongful use?"  The specific jury instruction pertaining to this claim told the jury that in answering this question they were to focus on the harm to

14

*Debra* telling it, ""One way Debra . . . can prove that Judith . . . took, appropriated, obtained, or retained Harry['s] property for a wrongful use or by fraudulent means is by proving that Judith . . . knew or should have known that her conduct was likely to be harmful to *Debra* . . . ." (Italics added.) Thus, by answering "Yes" to the special verdict question, the jury concluded Judith took Harry's property "with the intent to defraud or for a wrongful use" for purposes of proving *financial abuse of a dependent adult, i.e., Debra* because she knew her conduct was likely to harm *Debra*.

The next special verdict form was special verdict form No. 3, which pertained to financial abuse of an elder, i.e., Harry. It asked the same question 2, "Did Judith . . . take, appropriate, obtain or retain Harry['s] property with the intent to defraud or for a wrongful use?" but the specific jury instruction pertaining to this claim told the jury that in answering this question they were to focus on the harm to *Harry* telling it "One way Debra . . . can prove that Judith . . . took, appropriated, obtained, or retained Harry['s] property for a wrongful use or by fraudulent means is by proving that Judith . . . knew or should have known that her conduct was likely to be harmful to *Harry* . . . ." (Italics added.) By answering "No" to this question the jury concluded Judith did not take Harry's property "with the intent to defraud or for a wrongful use" for purposes of proving *financial abuse of an elder, i.e., Harry* because her conduct was not harmful to *Harry* and indeed could not have been harmful to Harry inasmuch as he was already deceased before Judith obtained or retained any of his property. In short, the two distinctly different financial abuse claims involved different victims and different harm. Thus, the favorable answer to question 2 on special verdict No. 2 was not inconsistent with the unfavorable answer to the same question on special verdict No. 3.

## II.  *Jury Trial*

Judith contends the judgment must be reversed because Debra was erroneously allowed a jury trial. We reject her contention.

15

Judith argues that although Debra's complaint sought damages for breach of contract, for which there would generally be a right to a jury trial (see *Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 (*Raedeke*)), her action was really a disguised probate action which can only be tried by a court in equity.[5] Judith points out Debra's complaint described Debra as "contestant" and, in addition to breach of contract and tort claims, contained an alternative "petition" section alleging Harry's trust amendment was invalid, and her prayer for relief sought "orders as requested herein under Probate Code [sections] 850 [petition for Probate Court orders], [and] 17200.1 [proceedings concerning transfer of property of trust] and other relevant code sections[]" in addition to damages. Although the matter proceeded to trial only on the breach of contract and financial abuse causes of action, Judith argues the contract claim was one concerning the internal affairs of Harry's trust (see Prob. Code, § 17000), and thus one to which there was no right to a jury trial. She argues the contract Debra seeks to enforce (e.g., Judith's promise to Harry to financially support her disabled sister) was really an oral agreement to amend the 2009 amendment to Harry's trust that left his entire estate to Judith. In her reply brief, Judith somewhat changes tack, arguing that not only was Debra not entitled to a jury trial, but the issues presented were within the exclusive jurisdiction of the Probate Court and could not be the subject of a civil action.

Preliminarily, we reject Judith's contention that because Debra's complaint contained allegations concerning equitable remedies under the Probate Code, she was not entitled to a jury trial. Although Debra sought relief under a variety of theories, by the

---

[5] Judith's only mention of Debra's financial abuse cause of action in this regard is to state that because the financial abuse cause of action incorporated by reference the allegations from the breach of contract cause of action, it too must be reversed. She cites to no authority and engages in no reasoned analysis of her point and thus it is waived. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*) [when appellant raises issue "but fails to support it with reasoned argument and citations to authority, we treat the point as waived"]; see also *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 (*Kim*) [same].)

16

time of trial only her breach of contract and financial abuse causes of action remained. In *Raedeke*, *supra,* 10 Cal.3d 665, because plaintiffs abandoned their equitable claims, the trial court erred by treating the jury's verdict on the legal claims as advisory only: "Thus, when the smoke . . . had finally cleared, plaintiffs were left with (1) a cause of action for damages for conversion, and (2) a cause of action for damages for breach of the oral promise to postpone the sale. As the relief sought in both causes of action was damages, and as the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded [citations], plaintiffs were entitled to a jury trial as a matter of right." (*Id.* at pp. 671-672.)

Debra's breach of contract cause of action is not one seeking to have Harry's 2009 trust amendment declared invalid or to "amend the amendment." Debra sought to enforce Judith's independent obligation to use those assets she inherited from Harry to provide Debra with financial support in accordance with Judith's agreement with him.[6] In this regard, her case is not unlike others in which agreements between siblings as to how to equalize their future inheritances were held enforceable via a breach of contract action. (See e.g., *De Mille v. Ramsey* (1989) 207 Cal.App.3d 116, 122-123 [upholding agreement between sisters to share equally in their mother's estate, even

---

[6]    At oral argument, Judith's counsel argued no assets from Harry's trust have ever been distributed to Judith, thus underscoring Judith's contention this matter belonged in probate court because it concerns the proper distribution of Harry's trust. The record contradicts this claim. Debra's first amended complaint, in paragraphs 16, 17, and 18, alleged numerous pieces of real property, bank accounts, and certificates of deposit were conveyed from Harry's trust to Judith, and in her answer at paragraphs 16, 17, and 18, Judith specifically admits those allegations. The record contains numerous quitclaim deeds showing various pieces of real property were conveyed by Harry's trust to Judith after his death and then conveyed by Judith to her own trust. Additionally, the original judgment contains provisions imposing a constructive trust on specific assets of Judith's that were *formerly* assets of Harry's trust, although the court subsequently entered an amended judgment nunc pro tunc deleting the constructive trust language.

17

though it changed the outcome of the terms of the will; *Spangenberg v. Spangenberg* (1912) 19 Cal.App. 439 [same].)

More importantly, Judith has waived her objection to the manner in which the case was tried because she raises it for the first time on appeal. Judith accuses Debra of having "wasted the court's resources" by involving Judith in "improper and unlawful proceedings" by proceeding via a civil action, and criticizes Debra and the trial court for "the confusion and perplexity caused by the failure to proceed under the Probate Code." But at no time below did Judith raise any objection to the breach of contract and financial abuse causes of action being tried before a jury and at no time did Judith object to the trial court's exercise of jurisdiction over this case. Judith concedes that to be the case lamenting in her opening brief that "[n]either the trial court nor counsel for the parties at trial seem to have recognized the requirement that this matter be tried to the court, not a jury, and that the trial be governed by the applicable provisions of the Probate Code."

Judith's acquiescence in the matter proceeding as a civil action tried by a jury is underscored by a discussion between the trial court and counsel concerning a question asked by the jury during deliberations. The jury was instructed on, and the case submitted to the jury with special verdict forms, concerning only the breach of contract and financial abuse causes of action. During deliberations the jury asked: "If we award a financial settlement in favor of [Debra] can it be placed in a special needs trust or conservatorship?" Debra's counsel urged that the court had authority to place a recovery into some kind of trust given her disability. The court commented it did not believe it had reason to place a damage award into a trust for Debra, and probably needed to transfer it to probate court were it inclined to do so. Judith's counsel objected the jury should be told, "No." Judith's counsel asserted a special needs trust was not within the jury's province saying, "This was not one of the questions in the jury instructions or anything before them. The jury isn't a probate court. . . . [¶] . . . I just think it's a remedy beyond this case. *We're not undoing the trust*. . . . " (Italics added.) The court answered

18

the jury, "'the subject of a special needs trust or conservatorship is not currently before the court, please do not consider it further in your deliberations.'"[7]

"One who by his conduct accepts a ruling of the court under circumstances amounting to acquiescence therein, may not complain of it on appeal." (*Allin v. Internat. etc. Stage Employees* (1952) 113 Cal.App.2d 135, 138 (*Allin*).) When a party acquiesces to a jury trial, she cannot complain on appeal a jury should not have been allowed. (See *Boone v. Hall* (1950) 100 Cal.App.2d 738, 741 [where party fails to object to trial court order granting jury trial, order not reviewable on appeal from the judgment]; see also *Taylor v. Union Pac. R.R. Corp.* (1976) 16 Cal.3d 893, 896, 899-901 [in reverse situation, court held "'a party cannot without objection try his case before a court without a jury, lose it and then complain that it was not tried by jury. [Citation.]' [Citations.] . . . 'Defendants cannot play "Heads I win. Tails you lose" with the trial court']; *Allin, supra,* 113 Cal.App.2d at pp. 138-139 [waiver due to plaintiff's failure to object to trial court order denying jury trial].)

Judith cites *Estate of Phelps* (1990) 223 Cal.App.3d 332, for the proposition the requirement that issues concerning probate matters be tried only before a court (and not a jury) is so rooted in public policy that it cannot be waived. But *Phelps* contains no such discussion. In that probate case, the executor filed a petition to recover real property decedent transferred to her daughter contending the transfer was obtained through undue influence. (*Id.* at p. 334.) The probate court concluded the causes of action for revocation of grant deed and quiet title were arguably legal in nature and so allowed a jury trial. The appellate court reversed the judgment in setting aside the

---

7       In her reply brief, Judith argues this jury question demonstrates the jury viewed this as a matter concerning the internal affairs of Harry's trust because the trust contained a provision for placing a disabled beneficiary's distribution in a special needs trust. But from the context, it appears the jury was not inquiring into whether it could enforce a term in Harry's trust by treating Debra as a beneficiary of the trust, but rather inquiring into whether any damages awarded for breach of contract or financial abuse could be placed into a trust to preserve them for her.

19

transfer because the court erroneously granted a jury trial on what were strictly equitable issues. (*Id.* at p. 341.) It remanded the matter to the probate court with directions that the trial court render its own decision and, if it chose, could do so based solely on the evidence originally presented at trial. (*Ibid.*) But there was no discussion in *Phelps* concerning whether daughter had objected to or acquiesced in a jury trial, or had otherwise waived the issue on appeal. "'It is well established that 'cases are not authority for propositions not considered therein." [Citations.]' [Citation.]" (*Gutierrez v. Employment Development Department* (1993) 14 Cal.App.4th 1791, 1797; *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [same].)

Judith also cites this court's opinion in *Soria v. Soria* (2010) 185 Cal.App.4th 780 (*Soria*) for the proposition her failure to object to a jury trial, or to the case being tried outside of probate court, does not waive it on appeal. In *Soria*, grandchildren filed a civil action against their grandparents in a dispute involving the grandparents' agreement with the parents to hold certain real property in trust for the grandchildren. (*Id.* at p. 784.) Their pleading contained causes of action for fraud, breach of contract, rescission, breach of fiduciary duty, common counts, and money had and received. A jury returned a verdict in favor of the grandchildren. (*Id.* at pp. 784-785.) Judith asserts *Soria* reversed the judgment in the grandchildren's favor because the matter was within the exclusive jurisdiction of the probate court even though no one objected to proceeding by way of jury trial.

Judith has mischaracterized the *Soria* case. *Soria*, *supra,* 185 Cal.App.4th 780, was an attorney fees case. Although the grandchildren secured a judgment in a civil action following a jury trial, they sought and were awarded attorney fees against the grandparents under Probate Code section 17211, subdivision (b), which allows a probate court to award attorney fees to the beneficiary of a trust who contests the trustee's account if the court determines the trustee's opposition to the contest was "'without reasonable cause and in bad faith.'" (*Soria*, *supra,* 185 Cal.App.4th at p. 786.)

20

This court reversed the attorney fees order because the civil action did not constitute a contest to a trustee's account within the meaning of the statute—such a contest could only be initiated in probate court—even though the grandparents had not objected to the case proceeding as a civil action. *Soria* did not reverse the judgment on the jury's verdict—it was not at issue. Moreover, in a footnote, *Soria* observed that although the grandchildren's underlying claims were within the jurisdiction of the probate court, "By hearing a matter within the probate court's exclusive jurisdiction, a trial court acts merely in excess of jurisdiction, not without jurisdiction. [Citation.] In this case, no party has objected to the trial court's exercise of jurisdiction over a matter exclusively within the probate court's jurisdiction, and therefore the trial court merely acted in excess of jurisdiction. [Citation.] As a result, the judgment is not void. [Citation.]" (*Id.* at p. 787, fn. 3.) Thus, *Soria* does not stand for the proposition that Judith can object for the first time on appeal to the matter having proceeded as a civil breach of contract action with a jury trial. (See also *Jovine v. FHP, Inc.* (1998) 64 Cal.App.4th 1506, 1527, fn. 26, 1530 [doctrine of waiver applies to voidable acts; unauthorized reference order is a voidable act in excess of jurisdiction, which may be waived by failure to object]; *Imperial Bank v. Pim Electric, Inc.* (1995) 33 Cal.App.4th 540, 545-546 [appellant waived any error from unauthorized reference proceeding by failing to object below].) "Appellate courts will not reverse for procedural defects or erroneous rulings that could have been, but were not, challenged below." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) ¶ 8:265, p. 8-169 [failure to assert error]; see also *Id.* ¶ 8.268, pp. 8-171 to 172 [failure to object].)

*III. Contract Enforceability*

Judith contends there is insufficient evidence of a valid enforceable oral contract between Judith and Harry that was intended to benefit Debra (Civ. Code, § 1559 [enforceability of contract made expressly for benefit of third person]). Judith argues the only evidence of a contract is that sometime after Harry amended his trust to leave

21

everything to her, he told her, "Take care of your sister" and when she asked what that meant, Harry said, "You figure it out kid." Judith argues this directive from her father was simply too vague and uncertain to constitute a contract—there was no mutual consent because there is no evidence she had any idea what Harry meant. She also contends there was no valid consideration for the contract. We reject her contentions.

We have two preliminary observations. First, much of Judith's argument is premised on her mischaracterization of the oral contract as one to make a testamentary disposition. She persistently refers to the contract at issue as being one to amend the 2009 amendment to Harry's living trust by which he left his entire estate to Judith, so as to leave trust assets to Debra. The agreement Debra sought to enforce was not for a new testamentary disposition by Harry; rather the agreement was that in exchange for Judith receiving her father's entire estate, instead of the one-half she was originally to receive, Judith would continue to provide financial assistance to her disabled sister.[8]

Our second observation is that to the extent the contract issues Judith raises are governed by the substantial evidence standard of review, she has forfeited them on appeal. The substantial evidence standard of review requires we view the evidence in the light most favorable to the judgment. We must presume the record contains evidence to support the verdict. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) An

---

[8]     For this reason we also reject Judith's separately briefed contention Debra's action is barred by Probate Code section 21700—the statute of frauds applicable to contracts to make a will or devise. As relevant here, that section requires that a contract to make a will either be in writing, or must be proven by "[c]lear and convincing evidence of an agreement between the decedent and another person for the benefit of the claimant or a promise by the decedent to another person for the benefit of the claimant that is enforceable in equity." (Prob. Code, § 21700, subd. (a)(5)).) Moreover, Judith did not raise this argument below, and it is therefore waived. (*Marshall v. Bankers Life & Casualty Co.* (1992) 2 Cal.4th 1045, 1059; *Panopulos v. Maderis* (1956) 47 Cal.2d 337, 340-341.) Although Judith did plead statute of frauds as a defense, she raised only the applicability Civil Code section 1624, subdivision (a)(1) [agreement by its terms not capable of performance within a year of making] in her summary judgment motion, and on appeal does not renew that contention.

appellant arguing the lack of substantial evidence "'[is] required to set forth in [her] brief *all* the material evidence on the point and *not merely [her] own evidence.*'" (*Ibid.*; *Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 53 (*Clark*); see also Cal. Rules of Court, rule 8.204(a)(2)(C) [appellant must provide summary of the significant facts].)

Judith's opening brief is woefully inadequate in this regard. She presents only facts that favor her arguments on appeal, completely ignoring any evidence that supports the jury's verdict. For example, her only mention of Debra's disability is a single reference to Debra having become blind in 1997. And the only facts she discusses concerning the contract are that Harry amended his trust to leave everything to her, and thereafter he made some vague statement about "take care of your sister" and that she needed to "figure out" what he meant by that. Judith's opening brief sets forth none of the evidence about Debra's lifelong health struggles, her medical disability starting in 1987, her asthma, diabetes, multiple hospitalizations, renal failure, organ transplants, or cancer surgeries. Judith does not discuss any of the evidence regarding Debra's limited financial resources ($900 a month in social security and $327 a month in long-term disability insurance), the significant financial assistance Harry provided Debra throughout her life, or repeated discussions between Harry and Judith regarding his concerns about what would happen to Debra after he died. Judith's opening brief does not mention Marjorie's testimony about the weekly discussions Harry had with Judith before and after amending his trust about his expectations Judith would take care of Debra by continuing to provide for her financial needs. Most remarkably, she makes virtually no mention of Kwan's detailed testimony regarding Judith's repeated acknowledgements to Kwan about promises to her father that she would provide financial assistance to Debra. Judith has forfeited any substantial evidence claims. We turn then to her specific legal arguments.

23

*A. Uncertainty/Mutual Consent*

Judith contends the oral agreement with her father is too uncertain and vague to be enforced. We disagree.

A contract requires: (1) parties capable of contracting; (2) mutual consent or assent between the parties; (3) a lawful object; and (4) sufficient consideration. (Civ. Code, § 1550.) The terms of a contract must be certain. (*Magna Development Co. v. Reed* (1964) 228 Cal.App.2d 230, 235.) Here, the trial court instructed the jury on both express and implied contract. "A cause of action for breach of implied contract has the same elements as does a cause of action for breach of contract, except that the promise is not expressed in words but is implied from the promisor's conduct." (*Yari v. Producers Guild of America, Inc.* (2008) 161 Cal.App.4th 172, 182.)

"'[T]he modern trend of the law favors carrying out the parties' intentions through the enforcement of contracts and disfavors holding them unenforceable because of uncertainty. [Citations.]' [Citation.]" (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1192.) To that end, a "contract will be enforced if it is possible to reach a fair and just result even if, in the process, the court is required to fill in some gaps." (*Ersa Grae Corp. v. Fluor Corp.* (1991) 1 Cal.App.4th 613, 623.) Nevertheless, "[w]here a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable. [Citation.] . . . Unless the court has ascertainable provisions of agreement before it, there is no contract on which the court may act." (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 481.) "To be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 770.) "'If there is no evidence establishing a manifestation of assent to the "same thing" by both parties, then there is no mutual consent to contract and no contract formation.'" (*Bustamante v. Intuit, Inc.*

24

(2006) 141 Cal.App.4th 199, 208.) "Whether a contract is certain enough to be enforced is a question of law for the court. [Citations.]" (*Patel v. Liebermensch* (2008) 45 Cal.4th 344, 348, fn. 1.)

Here, in exchange for her father leaving his entire estate to her, Judith promised to take care of her disabled sister's financial needs. While Harry's words were to the effect that Judith should "take care of [her sister]," we reject Judith's argument there was simply no way for her to know what that promise really meant. Judith acknowledged to Kwan and Debra that she understood the promise to mean she would "make sure [Debra] was provided for, taken care of, would have whatever [Debra] needed" and she would "take care of [Debra's] financial needs for the rest of her life.'"

Moreover, Judith would have us view her father's words in a vacuum. We cannot. "An implied contract is one, the existence and terms of which are manifested by conduct." (Civ. Code, § 1621.) The trial court instructed the jury with CACI No. 305, which states: "In deciding whether a contract was created, you should consider the conduct and relationship of the parties *as well as all the circumstances of the case*. [¶] Contracts can be created by the conduct of the parties, without spoken or written words. Contracts created by conduct are just as valid as contracts formed with words. [¶] Conduct will create a contract if the conduct of both parties is intentional and each knows, or has reason to know, that the other party will interpret the conduct as an agreement to enter into a contract." (Italics added.) Moreover, "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, § 1647.) For example, in *Byrne v. Laura* (1997) 52 Cal.App.4th 1054, 1066, the court held a decedent's oral promise to take care of his unmarried cohabitant was not too uncertain to be enforced against his estate noting, "It is unclear *how much* support [decedent] intended by his promises to take care of [his partner], but uncertainty about '"the precise act . . . to be done"' may be resolved in light of extrinsic evidence. [Citation.]"

25

Here, the totality of the circumstances including Debra's needs and the financial assistance Harry had been providing for her must be considered in assessing whether the agreement was definite enough to be enforced. Judith certainly understood both and cannot claim she did not understand what her promise to her father meant. Judith was well-aware of Debra's lifelong health struggles, her medical disability, and her blindness. Judith was aware of the comfortable lifestyle she and Debra enjoyed as a result of their father's largesse and well aware of Debra's own extremely limited financial resources ($1,237 a month income). And Judith understood the level of support Harry had provided to Debra throughout her life—reducing the mortgage on the Wabash house by $100,000 so Debra would have a place to live, assisting with her major expenses, paying expenses associated with Debra's guide dog, and providing her with financial assistance whenever needed. Judith also helped support Debra, paying expenses associated with the Wabash house after she moved out. In view of the family's history, the promise was certain enough to be enforceable.

*B. Adequate Consideration*

Judith also contends there was no consideration for her promise to financially support her sister. Judith argues Harry's amendment of his trust to leave his entire estate to her was not quid pro quo for her promise to take care of Debra because what Debra wanted as support was half of Harry's estate, leaving Judith in the same position she would have been had there been no amendment to the trust. In her reply brief, Judith posits she might have ended up worse off if the cost of caring for her sister exceeded half of their father's estate. Additionally, Judith argues there was no "nexus" between Harry's amendment of his trust and her promise because the trust amendment came *before* Harry asked Judith to promise to support her sister.

Judith agrees the issue of whether the contract is supported by adequate consideration is governed by the substantial evidence standard of review. (See *Dennis v. Overholtzer* (1960) 178 Cal.App.2d 766, 777-778, disapproved on other grounds in *Ellis*

26

*v. Mihelis* (1963) 60 Cal.2d 206, 221.)  Accordingly, her failure to fairly set forth all the relevant evidence in her opening brief constitutes a waiver of the issue.  (*Clark, supra,* 196 Cal.App.4th at pp. 37, 52 ["'Failure to set forth [all of] the material evidence on an issue waives a claim of insufficiency of the evidence'"].)

More importantly, even if the argument was not waived, there is substantial evidence to support the conclusion there was adequate consideration.  "Any benefit conferred, or agreed to be conferred, upon the promisor, by any person, to which the promisor is not lawfully entitled, or any prejudice suffered . . . by such person . . . as an inducement to the promisor, is good consideration for a promise."  (Civ. Code, § 1605; see *Peterson Tractor Co. v. State Board of Equalization* (1962) 199 Cal.App.2d 662, 670 ["Consideration is an act or return promise, bargained for and given in exchange for a promise giving a benefit to the promisor or imposing a detriment on the promisee"].) "[A]ll the law requires for sufficient consideration is the proverbial 'peppercorn.'" (*San Diego City Firefighters, Local 145 v. Board of Administration etc.* (2012) 206 Cal.App.4th 594, 619.)  Harry's estate was worth almost $4 million by Judith's own estimate.  He originally planned to divide it equally between his two daughters.  He amended his trust to leave the entire estate to Judith, in exchange for her promise to continue to financially support her disabled sister after his death.  Thus, depending on Debra's needs and lifespan, Judith gained well more than a mere peppercorn.  That in the end Debra was awarded damages equal to almost half the value of Harry's estate does not change the fact the consideration for the agreement was adequate, and Judith does not challenge the amount of damages awarded.

Judith's contention her promise to support Debra came *after* Harry amended his trust and therefore was not part of a bargained for exchange for Harry's leaving all his money to her (see *Passante v. McWilliam* (1997) 53 Cal.App.4th 1240, 1247 ["[c]onsideration must also be given in exchange for the promise[;] [p]ast consideration cannot support a contract"]), is based on her myopic recitation of the

27

evidence. Marjorie testified that for several years *before* Harry amended his trust he frequently discussed with Judith his concerns about Debra's health and her future, and repeatedly told Judith he expected her to financially care for her sister after he died. After he amended his trust, he continued to emphasize his directives to Judith and Judith never contradicted him. There was evidence Harry was very concerned about Debra's ability to manage any money that came her way and was worried a large inheritance would jeopardize her disability benefits or health insurance. Marjorie testified it was never Harry's intention that Debra be cut off. A jury could reasonably conclude that when Harry amended his trust to leave his entire estate to Judith, he did so with the understanding and expectation that Judith would assume financial responsibility for Debra, and that Judith understood that to be the case. The promise was supported by sufficient consideration.

## IV. Mistrial Motion

Judith contends the trial court erred by denying her mistral motion brought on the grounds Debra's counsel committed misconduct in questioning Judith about her own estate plan. We find no abuse of discretion.

On cross-examination, Debra's counsel asked Judith if "[t]he beneficiaries of your trust are your boyfriend and your two parrots?" Judith's counsel immediately objected the question violated the court's order on an in limine motion. The trial court agreed and sustained the objection. Out of the presence of the jury, the trial court criticized Debra's counsel for having "just blurted that out to them," when the court had earlier made it clear "that was not going to be the subject of examination." Debra's counsel alternately told the court he did not remember it had been the subject of an in limine motion, or that when it was discussed he thought it was "in a joking fashion." Judith's counsel moved for a mistrial. The trial court observed, "I think the real prejudice comes from the question, and the objection was immediately sustained, having to do with her estate plan. But now the trier of fact has learned that apparently it's her

28

plan to leave to two parrots." It took the mistrial motion under submission. Later in the day, the trial court revisited the subject, and despite Debra's counsel's insistence he did not believe the court's in limine ruling (which was unreported) precluded the question, the trial court again emphasized it considered it "impossible to me that someone would think that in good faith that would be a proper question." Judith's counsel argued the question was highly prejudicial in view of the punitive damages claim and it would unfairly prejudice the jury on the malice issue. The trial court denied the mistrial motion, noting "the jury did not hear an answer." Nonetheless, it offered to give a limiting instruction, but "we all know that highlights the issue . . . I think that does more harm than good, frankly." Judith's counsel did not request a limiting instruction.

Judith contends the trial court erred by denying her mistral motion. She complains she was unfairly prejudiced by counsel's attempt to put before the jury the fact she had made a testamentary provision for her pets. Her opening brief's argument is completely unsupported by any citation to legal authority or legal analysis, and thus we may treat it as waived. (*Badie, supra,* 67 Cal.App.4th at pp. 784-785 [waiver]; *Kim, supra,* 17 Cal.App.4th at p. 979 [same].)

Furthermore, we find no abuse of discretion. "The decision to grant or deny a mistrial is within the discretion of the trial court, which may properly deny the motion if it is satisfied that no injustice will result from the occurrences about which the moving party complains." (*Santiago v. Firestone Tire & Rubber Co.* (1990) 224 Cal.App.3d 1318, 1335.) We review a trial court's denial of a mistrial motion under an abuse of discretion standard. (*People v. Ayala* (2000) 24 Cal.4th 243, 283-284.) "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Williams* (2006) 40 Cal.4th 287, 323.)

29

Although on appeal Debra's counsel emphatically denies he understood the unreported order precluded his question, we defer to the trial judge's recollection of what transpired off the record in this regard.  But we must also defer to the court's ruling the transgression (whether deliberate or unintentional) did not warrant declaring a mistrial.  The question was not answered.  And even assuming the jury surmised from the mere asking of the question that Judith had in fact made testamentary arrangements for her pet parrots (some species of which are, after all, known for very long life spans), there is nothing inherently prejudicial about that information.  The majority of American households own pets and concern about their welfare after a pet owner's death is so prevalent that no fewer than 38 states including California have passed laws specifically providing for enforceable pet trusts.  (Prob. Code, § 15212 [trusts for care of animals]; see Sen. Com. on Judiciary, Analysis of Sen. Bill No. 685 (2007-2008 Reg. Sess.) Jan. 15, 2008 [over half of American households own pets; 38 states, including California, provide for creation of pet trusts and means for enforcement of pet trusts].)  We cannot say the trial court abused its discretion by concluding the question was not so inflammatory that Judith was denied a fair trial.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded her costs on appeal.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.

30